Sandra Sunderland and other appellants versus Bethesda Hospital. Ms. Smit is here for the appellants. Mr. Heffling for Bethesda. And Ms. Smit, you may begin when you're ready. Let's just wait a few minutes. Just one second. Let everybody get settled there. I think I have a chance to get my better glasses. I think she has your glasses right behind you. Good morning, Your Honors. May it please the Court opposing counsel. The question that's presented in this case is, can a hospital insulate itself from liability when they create a policy in which they give complete discretion to its nurses to decide who, what, where, and how accommodations will be provided to its disabled patients? The answer to that question should be a resounding no. However, that is exactly what happened here. In this case, the district court found that there was ineffective communication that was provided to these 12 deaf plaintiffs. In this case, there were nine that were remaining at the time of the decision. The judge found that there were comprehension failures, which were clearly known to the staff. In this case, the staff was the nurses. These nurses had complete discretion to decide whether communicative aids and whether communicative aids would be provided to the plaintiffs in these cases. Just as the doctors did in the Lisi case, which is where this judge made his decision from. So your argument, as I understand it, is that a nurse can constitute a hospital official. Correct. Who can be deliberately indifferent to the needs of the patient as long as the nurse has the discretion to determine whether or not this video remote interpreter device will be used, right? Well, in this case, the nurses are the gatekeepers. Yeah. They are the ones of the first responders and the only responders for all of these patients. These are deaf patients. They're sick. They're coming into the hospital. They're lying on a bed. We don't have that none of the nurses were deposed? We don't have any depositions of the nurses in the record? The records are quite clear, Your Honor, that there was ineffective communication, which is why the district court was able to find that there was ineffective communication. And in this case, there were also things that were in the record. I thought he found there was a jury question as to whether there was ineffective communication. Yes. The judge found that there was. You're correct, Your Honor. He found that there was sufficient evidence to show that there were comprehension failures, which caused a corresponding impediment to these plaintiffs' understanding while they were in the medical treatment. Sorry. Go ahead. But, I mean, the real issue is deliberate indifference, right? Correct. Okay. And so the position of Bethesda is that, well, let me ask you this. Is there anything in the consent decree that Bethesda had with the Department of Justice that required live interpreters, sign language interpreters at all? Hospitals can use these devices if they work, right? Absolutely, if they work. And therein is the issue, is that there's performance standards that are put out by the DOJ and the regulations. It's our position that the ERI did not work. But also, there is not only performance standards. There are situational guidance that is provided to the hospital. But there has to be evidence in the record in order to get to the jury that the patients didn't just prefer a sign language interpreter. Absolutely. And there is evidence in this record. As the district court found, there was ineffective communication. So there's records. There is a record that there is evidence that shows that there was ineffective communication. So it's not just that they asked for a VRI. And that's not what happened here. What happened, this case happened against, this policy was created against a backdrop of prior lawsuits against Bethesda Hospital. In 2005, a deaf couple sued Bethesda Hospital for failure to provide accommodations to them while they were in treatment. In that consent judgment, they agreed, putting them on notice, to certain situations which would require an interpreter, live or VRI. It does not matter. Because it is the same, Your Honor. I agree with this court. We have no issue with the fact that a hospital can provide VRI. The issue is when they provide VRI for every single situation that occurs, when they provide it when it doesn't work, and the sporadic use of the VRI. As is clear from the records of all these patients, there were days that went by that they had nothing. That these nurses used family members, used writing back and forth, rather than using interpreters. So in that 2005 consent judgment, there are specific situations in which it is outlined that you should use an interpreter. From admission, to medical history, to provision of medication, risk and benefits of procedures, diagnosis, prognosis, discharge. So this hospital knew those situations. When it created its new policy in 2011, after the regs were changed to say that you could provide an interpreter through a remote means, this hospital failed to provide any guidance to its nurses. The policy merely says you will use VRI. And if VRI... This is where I'm getting... You know, I want to go to the issue that is of concern, and that is whether there was deliberate indifference by a hospital official. Sure. You said the nurses were hospital officials and they were deliberately indifferent. But now you're saying there was no guidance provided. Now you're talking about somebody else besides the nurses. I'm saying that there was both. Okay. So besides the nurses, you may win or lose on their official status, who else have you got? The president of the hospital... Mr. Hill? Is that Hill? Mr. Hill. Okay. The president was notified when the president of the FAD came and met with him and explained to him that various deaf people in the communities and gave them antidotes of different patients who had been to the hospital during the prior year. And the president responded that providing on-site interpreters was too expensive, and therefore they would use VRI only. What the FAD president was trying to explain to him was that's fine, but then you have to train your staff and you have to know which situations you can use VRI and which situations you can't. And what is the evidence that Hill was deliberately indifferent? I mean, when the VRIs weren't working at all, they would call an interpreter, correct? No. I thought that happened. No. The record is replete with times when the VRI was not working. Okay. There's working and there's working effectively. I mean, when the VRI, like you couldn't turn it on, not working, they never called interpreters, that's in there? There's only one time out of all of these patients in which they called a live interpreter. Yet the records of Sandra Sunderland show the VRI was not working. Okay, so the evidence that Hill's deliberate indifference is? That he was on notice that their policy was having a problem providing accommodations to deaf patients effectively. So in the Doe case. What's the evidence in the record of that, that he was on notice that these VRIs weren't working? There is deposition testimony from the president of the FAD. And there is deposition testimony from Carolyn Parton, who was an interpreter who was present at that meeting. Was his deposition taken? His deposition was not taken. But there is evidence of that. And in the giving the non-moving party. Counsel, let's focus on this case. Okay. Did any of the plaintiffs contact Mr. Hill and say it's not working? Is there anything in this record that shows that any of these plaintiffs contacted Mr. Hill that it was not working? None of these plaintiffs could contact Mr. Hill. They were deaf. The issue in this case is that there was ineffective communication. They had difficulty communicating. So our position is that Gebser should not even apply in this case. They could communicate. I feel like I'm going in a circle. Your position is that the nurses were complained to. And then Judge Rustani's question, as I understand it, was, well, was anyone else complained to? And you didn't answer that question. At least I didn't hear you answer that question. And then Judge Wilson's question was, well, who was complained to? And then I said, well, was Mr. Hill complained to? And so I think the answer is no. Mr. Hill was not complained to by these particular deaf individuals. He was complained to about other deaf individuals who had a problem. Now, under the Doe case, which was decided by this court in 2010, complaints of lesser forms of discrimination or other forms of discrimination against other plaintiffs is sufficient notice to give this hospital, these administrators, notice of the fact that they have a problem with their policy. So your argument is that there are other plaintiffs who are not plaintiffs in this case who complained about the fact that the VRIs didn't work. That's the evidence. Gives actual notice to this hospital that they have a problem with their VRI system, yes. Okay. There's also complaints. And if I understand your argument, in addition, a nurse can be a hospital official. Absolutely. Within the meaning of our case law, I think the Lee C. case. If they have the discretion to determine whether or not the VRI is effective in each individual case, is that right? Yes. They have complete discretion from the time the patient comes in to even decide whether they're going to get the VRI, whether they're going to turn it on. How do we know that from the record, that they have that discretion? Their policy says that, and Gary Ritson says that. And their policy is in the record? Yes. And their risk manager. Written policy? Yes. And their deposition that was taken of the risk manager himself says that. The risk manager says, we rely upon the judgment of the nurses. The hospital's expert said the nurses have complete discretion to make all decisions about accommodations for their patients. Is Mr. Ritzer a person with deliberate indifference who's an official? Absolutely. And he is the risk manager. And his deliberate indifference, the evidence of that is? That he testified that six or seven deaf people called him and let him know that there were problems with, not six or seven deaf people, excuse me, six or seven nurses called him about complaints about deaf patients because they were saying the VRI wasn't working. He said to them, is the VRI working? And they said, yes. And he said, okay. He never came down, never checked it, never did anything. There's no way for a deaf patient to even have contact. This deaf patient who's lying on a bed has to have contact with this risk manager because it goes through the nurse. Isn't that what happened? Okay. I thought they have a policy that if you're denied by the nurse, then you can make a complaint up the line. No. Their policy, there's no policy that the deaf person has of that. There's no grievance procedure? There may be. But the deaf person, you understand the deaf person is having a problem with communication. Deaf people have an inability to often read English, which is very limited. They're sick. They're lying in a hospital bed. There's nothing posted on the wall that says, call this number if you're having a problem. And they couldn't call. They would have a problem doing that unless there was a VP in the hospital, which there was not, a video phone. In addition, I do want to stress that the most blatant evidence of deliberate indifference in this case is the sign. This hospital created this sign in 2011. This is what Mr. Ritson did after he got those complaints and did nothing about them. What he did and what he testified to is that he created this sign saying to, they say to the nurses, we say it's written to the patient. It says, we will use VRI for communication with our deaf patients. If you request or desire a live interpreter, you will have to pay for it. That was posted. That would make plenty of sense if the VRI was actually effective communication, wouldn't it? If the VRI was functioning and was effective, then it would make perfectly good sense saying, hey, we're not getting you, an interpreter, except at your own cost if this thing is working. If it's working and it's effective for that situation, you're absolutely correct, Your Honor. But that's the problem. There's no qualification on that sign. And this is the message that's being given to the nurses. This is what the nurses see, a sign that says, don't call us. The patient is going to have to pay for the live interpreter. So this is the message the nurse is getting all the way through. These nurses who have all this discretion and all this judgment can't understand that that kind of sign is qualified. These nurses who get the sign to say no. They're in this position with all this discretion and all this judgment, but yet they're not the kind of person in a kind of position where you would have the judgment to know that if the thing isn't working, you don't make the patient pay for the interpreter. You're saying, I mean, it sounds inconsistent to me. It does. But the fact that this hospital would even put out a sign like that is a violation of the ADA. I mean, you can't surcharge a patient for the cost of a live interpreter. You can't. You can't if the VRI is working? If the VRI is working and effective in that particular situation. But you understand that's why we have consultation with the deaf patient. There is no consultation. Not only did they create this sign, they stopped using the form in the consent judgment. There were specific situations which they knew they had to provide interpreters for. There was an admission form. Deaf people have a difficulty reading English, so there was an admission form that we had created that the hospital was to use, which had icons of different accommodations that they could provide. They stopped using that sign. You've reserved some time for revival, Ms. Smith. Thank you. Thank you. We'll hear from Mr. Halfland. Thank you. Please, the Court. We've been talking about the Rehabilitation Act claims specifically. And it's all about damages, right? Whether or not they're entitled to compensatory damages because the district court said they've been denied equal access, but they don't get compensatory damages unless they can establish there's enough evidence in the record to establish indifference by a hospital official. That's where we are, right? Correct. Okay. And we've got testimony in the record by all of these patients that these VRIs don't work. Correct. And would you agree with me that a nurse official, a nurse can be an official if they have the discretion to decide whether or not? No. The nurse, as the healthcare provider, has to be entrusted with the discretion to request whatever she needs or he needs to treat their patient to be able to communicate with them. What if the patient says they're getting ready for surgery and you're communicating with your doctor and there is a video recording device with the sign language interpreter on the other side and the patient does, it's not working. I can't understand it. It's fuzzy, it's blurry, which is what a lot of these patients said in their depositions. Does the nurse then have the discretion to bring in a sign language interpreter, a lab sign language interpreter? No. What the nurse is required to do and what was described in detail in Mr. Ritson's deposition and Dottie Kerr's deposition, who is a nursing supervisor and is the person who is kind of in charge of the video remote interpreting machine, is if the nurse has a problem, she will tell her charge nurse usually, which is a senior nurse on the floor, or will directly call the nursing supervisor and there is always a nursing supervisor available. The nursing supervisor then will determine what the problem is. And if it's a technical issue, Bethesda has an IT department who will come and try to remedy the problem and often can do that. And there are records of that occurring in this case in this record. So there is evidence of that in this record? Yes. Is it Dorothy Kerr? Is it Kerr? Who is the nursing supervisor? Dorothy Kerr. She was deposed. Okay. But she did not, she actually was involved with one of the plaintiffs, in this case Carol Ann Donofrio, who the video device didn't work. The nurse followed the protocol that they always followed and talked to her charge nurse who then called the nursing supervisor who then came, had IT look at it, they couldn't get it to work. The nursing supervisor then made the call to the administrator in the hospital, the official from the hospital, because it was in the middle of the night, and said we need an interpreter to come to the hospital for this patient. What patient was it? Was it a plaintiff in this case? It was a plaintiff in this case. Which plaintiff was it? Carol Ann Donofrio. There was also a prior. Okay. I think that's the one example that your opposing counsel was saying, it didn't work, they brought in the live interpreter. Also in the record, long, long ago in the record in this case, there was a plaintiff named Morris Steiner who had a couple visits, outpatient ambulatory care visits at the hospital. An on-site interpreter was acquired for him. He is no longer a plaintiff. He passed away and they did not add his estate as a plaintiff and subsequently amended the pleadings and did not include him. They filed a motion for a preliminary injunction in this case for someone who was not a plaintiff in this case, and that ultimately was denied, but it's part of the record. That woman who was pregnant had come to the hospital unrelated to her pregnancy to the emergency room for a prior child, and an on-site interpreter was provided for her when the VRI wasn't able to provide effective communication. So it's not the case that we've only ever done it one time and that we are hiding behind our nurses. We rely on our nurses to determine what is needed to communicate with this patient. And to make the argument that the nurses are some kind of, you know, devious people who are shielding and preventing these people from communicating is just ridiculous and it's not supported in the record. What if the device works for Ms. D'Onofrio but doesn't work for Ms. Sunderland? Shouldn't we look at, I mean, it seems like the district court looked at each individual plaintiff. It did. And so we should do the same, right? And we should. Just because it worked for Ms. D'Onofrio does not necessarily mean that it worked for Ms. Sunderland, right? Correct. And for Ms. Sunderland... Ms. Sunderland was preparing for surgery. Yes. And she says it was blurry and it froze and she couldn't see the sign language interpreter on the other side at the beginning of the surgery. And her son was there and he said it didn't work and he complained and then after they complained they couldn't do it. So, I mean, it seems, why is there a tissue effect? That's not correct because the surgery that she was preparing for, she had come in at the middle of the night into the hospital to the emergency room. They stabilized her for an apparent heart attack. They stabilized her in the ER. They took blood gases every few hours and communicated with her personal cardiologist what those readings were. Her personal cardiologist, not in the hospital, at his office or at home at 6 o'clock in the morning, ordered a cardiac catheterization by a particular doctor who was not Bethesda's doctor. We don't have an on-staff cardiac catheterization invasive cardiologist. He came to the hospital and met with Ms. Sunderland and her son and discussed what he was going to do with her and was able to communicate without using an on-site interpreter or the VRI. He did not ask for it. I took his deposition. And he said he was able to effectively communicate with his patient. He knew that if he needed anything else to communicate with Ms. Sunderland, all he had to do was ask a nurse and they would follow it up and get him what he needed. But he didn't need it. She then went into surgery, the catheterization. He repaired a blockage in her heart. She was in the recovery room when she had a bleed from her groin where they put the catheter, and she had to be rushed into emergency surgery. Now, there was no time to get an interpreter for that, and there was no decision, frankly, to be made, although they did talk to her son who was there and told him what was going on because she either needed to go in for emergency repair or she would have died and she went in for emergency repair. Now, the one complaint that is in the record about Ms. Sunderland complaining about the VRI is she and her son told the nurse or through the son told the nurse, my mom, Ms. Sunderland, doesn't like the VRI. She wants someone in the room with her. The nurse didn't ignore it, didn't insulate Bethesda for all this bad behavior. She called her charge nurse, and the charge nurse called the nursing supervisor, and the nursing supervisor came down to the room, turned on the VRI, and talked to Ms. Sunderland for a half an hour with that VRI and explained, this is what we use, and it's noted in the record that the VRI worked properly and it was in her room and that the patient understood what they were telling her. That's what's in the record. They cite to that record notice in the briefs, and I apologize in my... Ms. Sunderland says it never worked, basically. Well, then why isn't that an issue for the jury to decide whether or not they're going to believe the hospital officials or they're going to believe Ms. Sunderland and her son? Well, as I argued in front of Judge Hurley in the district court when we had this, that I would concede for the purposes of the summary judgment hearing, there is a disputed issue of fact of whether there was effective communication. We have doctors, we have medical records that all say they were able to communicate, the history is correct, everything in there points to that there was effective communication, and then we have nine plaintiffs who say it never worked. Okay, but if there's a disputed issue of fact as to effective communication, that same evidence also goes to deliberate indifference, doesn't it? I mean, if there's a decision that there isn't effective communication and then nobody does anything about it, that is kind of the same, it becomes the same issue, doesn't it? But there is no evidence that there was a complaint or a problem with the VRI. No one did anything about it. Can I just ask you about the nurse issue confuses me some, and I think the point isn't so much of big allegations of hiding behind the nurses. If the nurse decides there's no problem and therefore doesn't go higher, then is the patient out of luck? Is there only means of communication basically through that nurse? That's essentially what your opposing counsel was saying, that there's no effective grievance procedure, complaint procedure, that can be used for these patients, and the nurse really is the end point when you're talking about a denial. That's what I think the argument is. Well, I would say that the record disproves that allegation, that concoction. Okay, how? Because with Ms. Sunderland, the charge nurse was called, the nursing supervisor was called. That's where the nurse didn't decide to do a denial. She decided that there was an issue here and she had to go higher. But a nurse could have just, like, read the sign and said, we got a VRI, you don't like it, too bad, you have to pay for a private interpreter if that's what you want. There is no evidence in the record that any of these plaintiffs saw this sign, and it wasn't posted for the world to see. The evidence is it was taped to the desk next to the keyboard of this so that the nurses would have a consistent response to the patient when the patient refused to use the VRI, not that you didn't like it or it's not working, but this is how we provide it. If you refuse to use this and you want to get something else, you can pay for it. And there's no evidence that any plaintiff was ever told that by a nurse. There's no evidence that a nurse needed a VRI. Here's the problem that comes up, and what we're dealing with here, is that because the VRI is so easy to use, they use it when they don't need to use it. And if they don't need to use it, if they come in and they turn it on and they're going to tell the patient, we're going to get you up and give you a bath or take you to the bathroom and we'll get your food, and for some reason the nurse can't use it or they can't connect to an interpreter, they're not going to call for an on-site interpreter. How do they tell them that if they're deaf in the absence of a VRI? I don't think it's ever been argued that the only way these people can communicate about anything is with a VRI. And we had evidence in the record for every single one of these plaintiffs that they read newspapers, they watch TV with closed captioning, they use text messaging. They're not as illiterate as Ms. Smith would argue that they are. But one of the things in the DOJ, she mentioned, my time's running short, she mentioned the DOJ and the consent judgments. They do not require us to use an interpreter for particular instances. Neither one of those documents do. And the DOJ regulations concerning the use of VRI and on-site interpreters do not require it. There is never the word in these instances an interpreter shall be used. It's in these instances an interpreter may be used. But ultimately the hospital under Article or under Title III is... But it's got to work and be effective. Correct. But the other thing we don't have in this case is... To answer the question about how they communicate, I take it when it's just a short direction, either a sign or two or three words on a piece of paper may do the communication. If it's like, you're going to get up now and walk. I take it those kinds of things can be... What you need a VRI for is this is the procedure we're going to do, this is the kind of medicine you're going to do. Maybe it's not specifically in the papers. This is what you need to do upon your discharge. Complicated stuff. You're going to get up and walk now. I would think that would be easy to communicate. The Department of Justice does advise that the more complex, the more stressful the situation will be, the more likelihood it is that you're going to have to escalate what auxiliary aid you choose. But they don't mandate it. And what we don't have in this record is for all the... I mean, this is essentially 10 lawsuits with 10 patients who were in the hospital, thousands of medical records. And to go cherry pick it, one little thing where it didn't work. But what's not in the record is what was trying to be communicated at that time when the nurse made the decision to call the charge nurse or not call the charge nurse. We don't know because they didn't depose a single health care provider other than Dr. Deitch, who was a hospitalist for many of those. So they kind of killed two birds or nine birds with one stone in this case. And he testified that he always ensures that he can communicate with his patients. And he does that by whatever means he needs. And he can tell as a health professional that the responses are correct and he's getting what he needs from his patient. Number two, he knows what they use at Bethesda. Number three, he's used the VRI system at Bethesda. And he's never had a problem with it. He's never been denied any requests by the hospital. And he's never had an instance where he felt he couldn't communicate with his patient. That's the only health care provider who has testified in this case other than Dr. Cardenas, who is not a hospital employee, but Ms. Sunderland's cardiologist who testified the same way. Mr. Huffling, are you counsel for Baptist Hospital and Silva? I am not. Okay. Is there anything about that? We don't have an opinion yet in that case. It was heard by another panel. We don't really know anything about that case. We haven't read the briefs in that case. Is there anything about that case that should inform us with regard to this case? I did not follow that appeal particularly, but I know that Judge Williams, because I had mentioned that, her ruling to Judge Hurley, that she had kind of looked at the outcome to find and I said, there's this case and he's even looking at it. Judge Hurley rejected that and I think he probably was correct rejecting that. But in any event, this is a different hospital. Different hospital. The facts are different, so there's nothing about that case. I mean, this is fact specific. Are there issues of fact in this case? I do not. Take the case of the jury. So there's nothing about Silva versus Baptist Hospital that should inform us with regard to deciding this case, right? Yes, sir. I know there was two plaintiffs involved in Silva and I believe the court, the allegation was the VRI did not work at times. At Baptist. At Baptist. And that there was more evidence about the system itself at Baptist than there is in our record, but honestly, I don't know. I got you. Thank you. Thank you. Ms. Smith, you've reserved some time. Your Honor, defense counsel mentioned Dr. Deitch and said that there was no evidence that Dr. Deitch had a problem with the VRI system. In Sandra Sunderland's records, there is a clear notation that Dr. Deitch refused to use the VRI, presumably because it doesn't work or because it's so difficult to turn on. And this is the pattern that we see often in these medical records, is that these patients will sit for days without any kind of accommodation. Sandra Sunderland came in the night before she had major cardiac catheterization, a heart procedure. She had a heart attack. This hospital made no efforts to get a V, even the VRI, which defense counsel says is so easy to turn on, they didn't even bother to bring in the VRI. There was no form of communication with this woman. They came in and they did a cardiac catheterization. She was in the procedure. She testified to waking up later on after she was in recovery, seeing blood all over her. Defense counsel says they explained to the son, because it was an emergency procedure, that they had to do surgery. She was awake. They should have explained to her. She thought she was dying. There was no one there to explain anything to her, not even the VRI system. And this is the problem, and this is recurrent in all of these hospitalizations. The records show that there are days and days and days in which no VRI is used. The records show for Carolyn Donofrio, she came back a year after this complaint was filed in 2013. She came back in 2014. She was there for a week. The records show the VRI machine does not work. The nurses put that in the record, but yet they did nothing. They did not bother to notify anybody, and their decision was not subject to any kind of reversal, as in the Lisey case. In the Lisey case, at least you have doctors that are employees of the hospital. Here we have no doctors. There is no barrier between the nurse and the administration. They have made their policy so difficult that it is almost impossible for them to be sued for this kind of behavior, and this behavior will continue to happen because they've insulated themselves by saying the nurses are the officials. Besides all of that, Your Honor, it is not clear that GEPSR is the correct standard to even apply in this kind of a case. In GEPSR, there was no policy. In this case, there is a policy, and the Supreme Court specifically held that their ruling was limited to cases with policy, without policies. Further, GEPSR was created as a result of a sexual harassment case where a student was sexually harassed. What they said, and in that case, under Title IX, you have to give notice to file an administrative hearing. What exactly is the policy? The policy here is you will use VRI for communications with deaf patients. If it does not accommodate patient need without any kind of explanation, you will contact the administration, basically. That is the policy. There is no guidance. This is the same problem that was in Leasee. The only difference here is that it's the nurses because there are no doctors in between those two levels. This policy will allow this situation to continue to happen again and again and again, unless we are permitted to reverse this judge's decision and bring this case back to the active trial list. All right, I think we have your argument.  Thank you.